THE TOWN OF LONDONDERRY *v.* THE TOWN OF ANDOVER,
*Appellant.*

*Evidence of organization of a town. Settlement of paupers.
Proof of former residence.*

The due organization of a town, previous to a particular time, may be presumed from the fact that at that time they had appointed town officers, and were exercising the rights and powers belonging to organized towns.

Londonderry v. Andover.

A legal settlement could be obtained by one years continuous residence in a town in this state, between the years 1779 and 1787, and a settlement acquired in that way by a father, would be communicated to his minor children.

And a derivative settlement so obtained by a son, would be communicated to his children afterwards born out of the state, and while he was residing out of the state, if, during their minority, he removes with them into the state.

But if the father, after obtaining such a settlement, had removed to a foreign country, where his children were born, and from which he did not return during their minority; *Quaere*, as to the children having their father's settlement upon their subsequent removal into this state.

The declarations of a person, as to the place of his former residence, are not admissible for the purpose of proving that he actually did reside in that place,

APPEAL from an order of removal of a pauper by the name of Maria B. Hathorn, from the town of Londonderry to the town of Andover. Plea, that said pauper was unduly removed, because her last legal settlement was not in said Andover; trial by jury, April Term, 1855,—UNDERWOOD, J., presiding.

The plaintiffs gave evidence tending to prove that said pauper had not gained a legal settlement in Londonderry, and that, before she removed to Londonderry, she had lived in Andover nearly eight years, after she was eighteen years old, and supported herself during said term. It was conceded that the pauper had resided in Andover a sufficient length of time to gain her a settlement there, provided she had previous thereto a settlement in any other town in this state. The plaintiffs relied upon one Eleazer Hathorn, Jr., having gained a legal settlement in the town of Reading, Vt., between 1779 and 1787; and gave evidence to the jury tending to prove that Eleazer Hathorn, the elder, moved from Jaffrey, N. H., with his son, Eleazer Hathorn, Jr., in 1781, or soon after; and that said Eleazer, Jr., was then about nineteen years old, and that he lived with his father until he was twenty-one years old, and then lived in different places in Reading for several years thereafter, before 1787, and then went to New Hampshire, and there married a wife, by whom he had several children; that his wife died, and about 1809 he married the pauper's mother; that the pauper was born in September, 1818, in Sullivan, N. H., and lived there in her father's family until 1825; then moved with her father's family to Springfield, Vt., and stayed there about three months; then removed to Andover, Vt., where she lived with the

28

family until her father's death in 1826; and then lived with her mother in Andover until 1846; and then moved to Londonderry.

The defendants gave evidence tending to prove that the said Eleazer Hathorn, Jr., did not remove to Reading with his father, but continued to reside in said Jaffrey, until about 1787, when he came to Reading, stayed there several years, then returned to said Jaffrey, and lived there and in other towns in that vicinity, in New Hampshire, until he removed to Springfield, and that he resided in said Jaffrey in 1784, 1785 and 1786.

The evidence on the part of the plaintiffs to prove that Eleazer Hathorn, Jr., resided in Reading, previous to 1787, was contained in depositions of his widow, daughter, and several other persons, who appeared to have had no actual knowledge respecting his residence at so early a period, but deposed to what they had heard him and other members of his father's family say in reference to his and their having formerly lived in Reading :—to so much of the depositions as related to these declarations, the defendants objected, but the objections were overruled, and the depositions read.

There was no dispute but that Eleazer Hathorn, senior, moved to Reading some time in 1781, and evidence was given tending to show that the town of Reading was organized after he went there, but at what time such organization took place did not appear ; and evidence was introduced by the plaintiffs, consisting of grand lists, deeds and records, showing, or tending to show that there were listers and a town clerk, and that the town was acting as an organized town as early as 1781.

The jury were instructed that the settlement of the pauper in the defendant town, depended upon their determination of the question, whether her father, E. Hathorn, Jr., obtained one in Reading between the years 1779 and 1787, as the testimony tended to show; if he did obtain such a settlement, the pauper would take it derivatively from him. They were further told, upon this point, that the important inquiry was *when* Eleazer Hathorn, senior, and his son, Eleazer Hathorn, Jr., went to Reading to reside ; that if they should find that Eleazer Hathorn, senior resided and made it his home one full year continuously in Reading, between the years 1779 and 1787, and before the said Eleazer Hathorn, Jr. became of age, then they would find that the senior Hathorn obtained a

settlement there, and the younger Hathorn obtained one derivatively from him. Or, if the jury should find that E. Hathorn, Jr., the pauper's father, resided in Reading after becoming of age, one full year continuously, and made it his home there between the years 1779 and 1787, then said E. Hathorn, Jr. gained a settlement there in his own right; and if he thus gained a settlement in either of these ways, the same would be communicated to and give the pauper a settlement there, by which she would now have a settlement in Andover, and their verdict must be for the plaintiffs.

Upon the subject of the organization of Reading, the jury were told that, from the fact that the several lists of that town put into the case, and sundry deeds showing that there were a town clerk and listers in Reading as early as 1781, and the town appeared from their records' to have been officered and conducting affairs as an organized town, the jury might presume the town was duly organized. To this charge, and to the admission of those parts of the depositions which were objected to, the defendants excepted. Verdict for the plaintiffs.

*S. Fullam* for the defendants.

The sayings of E. Hathorn, Jr., were nothing more or less than hearsay. Such sayings are never received in evidence, except as a part of the *res gestae* accompanying and explaining acts, from which some inference may be drawn in favor of the issue. 1 Stark. Ev. 41, 44, 47, 49.

The jury were not at liberty to infer an organization of the town from the fact that such town had officers and lists, immediately after its first settlement. It might, perhaps, be inferred from an user for a sufficient length of time.

Lists would afford no evidence of organization. By the act of 1789, people residing in "peculiars," (not within the limits of any town,) were to be taxed for their lands, persons and estates thereupon; State Papers 297. Peculiars were to have officers; State Papers 303.

There was no law prior to 1787 regulating settlements. It has been supposed by some that the acts of 1778, now lost, contained

some provisions on that subject, but the journals of that year show no such thing.

The acts of 1779 were the only laws on the subject before 1787, and these were mere temporary acts, to continue in force but eight months, and made for the temporary relief of the poor, and are entirely silent on the subject of settlements, and the very titles to the acts show that they had no other meaning, said acts being, with their original orthography, punctuation and capitals, as follows :

"*An Act for the ordering and disposing of transient Persons.*

" That the Select-men of each respective Town in this State, shall be, and are here-
" by authorized and impowered, to warn any transient person (residing in such
" Town, that is not of quiet and peaceable Behaviour, or is in their Opinion, like to
" chargeable to such Town) to depart out of such Town, except such person does
" obtain a Vote of the Inhabitants of such Town, in legal Town-Meeting, to ‚remain
" in such Town ; and if any such Person or Persons being so warned, do not leave
" such Town within Twenty Days after such warning, then one or more of said
" Select-men, may make Application to an Assistant or Justice of the Peace,
" who is hereby empowered to issue his Warrant, to the Sheriff or Constable to
" take such Person or Persons, and transport him or them to the next Town towards
" the Place where such Person was last an Inhabitant, in the same Manner to be
" transported to the Place where such Person or Persons were Inhabitants last, or
" in the same Way out of this State, if he be not an Inhabitant thereof, and all such
" Expence shall be paid by the Person or Persons so warned, if of Ability, but if he
" ¸is not of Ability to be paid by such Town,

" *Provided always* That no Person shall be subject to such Warning after he or she
" has lived in such Town one Year.

" That if any transient Person or Persons, shall be taken sick or lame in any Town
" in this State, whoever shall keep any such Person or Persons, (if such transient,
" sick or lame Person or Persons be not of sufficient Ability,) shall defray such Ex-
" pence, until complaint thereof be by him made to to the Select-men of such Town
" after which such Select-men shall provide for such transient, sick or lame Person
" according to law."—Acts of 1779, 25.

"*An Act for maintaining and supporting the Poor.*

" That each Town in this State shall take Care of, support and maintain their own
" Poor.

"And that if any Person or Persons, shall come to live in any Town in this State,
" and be there received and entertained by the Space of Twelve Months; and if by
" Sickness, Lameness, or the Like, he or they come to want Relief, every such Per-
" son or Persons, shall be provided for by that Town wherein he or they were so
" long entertained at said Town's own proper Cost and Charge, unless such Person
" or Persons by Law are to be provided for by some particular Person or Persons;
" or unless such Person or Persons wanting Relief have within the said Twelve
" Months, been warned as the Law directs, to depart and leave the Place; And if
" such Warning be given, and the same be certified to the next Superior Court, to
" ‚be held in the same County, the said Court shall and may otherwise order the
" defraying of the charge arising about such indigent Person or Persons."—Acts
of 1779, 97 & 8.

These acts were declared to be temporary, and to remain in force until the rising of the general assembly in October follow-ing, (8 months.)

These acts, being temporary, have no effect in fixing a settle-ment; indeed the word settlement was not used in them, and the spirit and intent of these acts, clearly show that nothing was in-tended but to make temporary provision for the poor.

No trial was provided for before moving a person, and no appeal was allowed; there was no tribunal to settle the question between the towns, or before whom any question could be settled, nor had the person thus removed any opportunity even to protest against the proceeding, the selectmen ordered him to go, and if he neg-lected, without notice to him, any magistrate applied to issued a warrant, and ordered his removal, not to the place where he had been entertained "by the space of twelve months," but to the place where he was last an inhabitant.

The acts of the February session, 1779, only continued in force until the next October, while those of the June session of 1779, were continued in force until 1787. State Papers 388, 391, 397, 421, 444, 467, 482, 496, 504, 510.

There was no law in force in relation to paupers, after E. Ha-thorn, senior, moved to Reading in 1781, until 1787, and hence the charge was wrong in relation to his residence.

It was error to charge that a derivative settlement could be ob-tained at all before 1787. There was no statute upon that subject until that time. There certainly is no common law sanctioning it, and the English statutes make no mention of it, at least until since the 14th of Charles II., although the English courts held, that a man's family residing with him, whether of age or not, had his settlement. 12 Richard II., chap. 7, enacted that the poor were to repair, in order to be maintained, to the place where they were born. By 11 Henry VII, chap. 2, they were to repair to the place where they last dwelled, or were best known, or were born. By 19 Henry VII., chap. 12, they were to repair to the place where they were born, or made last their abode by the space of three years. By the act of 1 Edward VI., chap. 3, this was explained to be where they had been most conversant by the space of three years. By 1 James I., chap. 7, they were to be sent to the place of their dwel-

ling, if they had any, if not to the place where they last dwelt by the space of one year; if that could not be known, then to the place of their birth. This continued to the 13th and 14th of Charles II, which reduced the term of one year to forty days. 3 Burn's Justice.

While a child was within the years of nurture, (under seven years old,) he could not gain a settlement in his own right, but after that he could gain a settlement in his own right by a residence of forty days, under an indenture. 3 Burn's Justice 586.

It was necessary that the son reside with the father to take the father's settlement. *Bugden* v. *Ampthill*, Bur. S. C. 270. 2 Bott. 66. *Barton Turse* v. *Happisburg*, Bur. S. C. 49. *Halifax* v. *Warley*, 3 Burn's Just. 592. *East Woodbury* v. *West Woodbury*, 3 Burn's 589. *King* v. *Sowerby*, 2 East 276. *King* v. *Cowhoney born*, 10 East 88.

The ancient rule of law was that birth gave a settlement. *Rickmensworth* v. *St. Giles*, 3 Burn's Just. 583. *Cripplegate* v. *St. Saviours*, 3 Burn's Just. 584. *Rex* v. *Heaton Norvis*, 5 Geo. 1.

But if he had a derivative settlement from the elder E. Hathorn, we insist he could not transmit it to his daughter thirty years after he left this state. A settlement out of the state was regarded by the statutes up to 1801. State Papers 303, 315.

*Butler & Knowlton* and *H. E. Stoughton* for the plaintiffs.

One year's residence between 1779 and 1787 was sufficient to give a legal settlement. See Slade's State Papers 378-9, and forward. See also *Corinth* v. *Newbury*, 13 Vt. 496.

During this period of time, and up to 1817, the common law relative to derivative settlements was in force. *Wells* v. *Westhaven*, 5 Vt. 322. Slade's State Papers 450.

At common law, the settlement of the father is communicated to the minor children born out of the state, (*Freetown* v. *Taunton*, 16 Mass. 52,) even though they were children by a second wife whom he married out of the state; *Cambridge* v. *Lexington*, 1 Pick. 505. And the original settlement from which a pauper's may be derived, will be communicated to all posterity, unlesss another settlement is gained in some town in the state. *Bridgewater* v. *Bridgewater*, 9 Pick. 55. These cases all arose prior to 1767,

up to which period the common law, relative to derivative settle-ments was in force in Massachusetts. *Freetown* v. *Taunton,* 16 Mass. 52.

The common law as to derivative settlement, prevailed in New Hampshire up to 1796, and it was held, *(Landoff* v. *Atkinson,* 8 N. H. 532,) that a settlement, once gained could not be lost except by gaining another settlement in some other town in the state. Such settlement is not affected by gaining a settlement in another state, and the right of settlement would be transmitted to children born in such other state, so as to avail to them on their return.—*Ib.*

Statements of the pauper's father are admissible upon the ques-tion of pedigree. 1 Green. Ev. § 103, 104. *Waldron* v. *Tuttle,* 4 N. H. 371. And it is no objection that it is hearsay upon hear-say, provided all the declarations are within the family. 1 Green. Ev. 120, note.

The jury were properly instructed as to the evidence from which they might presume the organization of the town of Reading.


The opinion of the court was delivered by

ISHAM, J. This is an appeal from the order of removal of one Maria B. Hathorn, a pauper, from the town of Londonderry to the town of Andover. The pauper was the daughter of Eleazer Hath-orn, jr., and the grand-daughter of Eleazer Hathorn, sen. It ap-pears from the case that the pauper was born in the state of New Hampshire, in 1818, and that she resided in that state in her fath-er's family until 1825, when she removed with her father and his family to Springfield, in this state, and soon after to Andover, where her father died in 1826. It also appears that the pauper continued to reside in Andover with her mother until 1846, when they re-moved to Londonderry, from which place this order of removal was made. The general question in the case arises, whether the town of Andover is the place of the pauper's legal settlement. It is conceded that the pauper, after she had arrived at full age, resi-ded in the town of Andover sufficient time to gain a settlement in her own right, provided she had a previous settlement in any oth-er town in this state. As the pauper was born in New Hampshire, and had not acquired a settlement in this state in her own right, it became necessary for the town of Londonderry to show that her

father had had such a settlement, and that his settlement was com-
municated to the pauper. In that event, the pauper, by her resi-
dence in Andover, would have acquired a legal settlement in that
town; otherwise, the town of Andover is not chargeable.

On the question as to the residence of Eleazer Hathorn, jr., the
father of the pauper, in this state, testimony was offered tending to
prove that Eleazer Hathorn, sen. removed from New Hampshire
to Reading, in this state, with his son, then 19 years of age, about
the year 1781; and that after that period, he resided in different
places in Reading for several years before 1787, when he removed
to New Hampshire. Upon those facts, the court charged the jury
that if they found that Eleazer Hathorn, senior, resided and made
it his home one full year continuously in Reading, between the
years 1779 and 1787, and before Eleazer Hathorn, jr., the pau-
per's father, became of age, that he thereby obtained a legal settle-
ment in that place, and that Eleazer, jr. thereby also obtained a
derivative settlement from him in that town; or if the jury should
find that Eleazer jr. resided in Reading after full age, one full
year continuously, and made it his home there, between the years
1779 and 1787, that he gained a legal settlement in that town *in
his own right.* To this charge of the court several objections have
been taken by the defendants. In the first place it is insisted that
competent evidence was not introduced, showing the existence and
organization of the town of Reading at that period. The court
charged the jury that as it appeared from their records that as
early as 1781, the town had appointed their officers, and were con-
ducting their affairs as an organized town, the jury might presume
the town was legally organized. We see no objection to that
charge of the court. Towns are *quasi corporations,* and it is not
necessary for this purpose to show a strictly legal organization.
It is sufficient that the town was organized *de facto.* The appoint-
ment of listers, a town clerk, with other town officers, and the fact
that they were then exercising those corporate rights and powers
belonging to organized towns, was sufficient *prima facie* proof of
their due organization, and sufficient to cast the burden of proof on
the town of Andover to show it otherwise. It has been held in
several instances that testimony of that character was sufficient to
show the due organization of corporations of a more private char-

acter, and in cases where the parties would be held to 'more strict and technical proof; *Searsburgh T. Co.* v. *Cutler,* 6 Vt. 315 ; *Bank of Manchester* v. *Allen,* 11 Vt. 303.

It is also insisted that the court erred in their charge to the jury, in saying that a legal settlement could be obtained in Reading, previous to the year 1787, and particularly, that a derivative settlement could be communicated to the father of this pauper under the law of this state then in existence. But we think the instruction of the court to the jury on that subject, was correct. It is true that the act of 1779 has particular reference, in its provisions, to transient poor, and directs the manner in which they shall be removed to the place they last inhabited. It is also true that that statute was temporary, but it was by successive acts continued in existence and in life until 1787, when more general and permanent provisions in relation to settlements were enacted. Under the act of 1779, it was provided that no person could be warned or removed from any town in this state, after he had lived in that town for the period of one year. The case of *Corinth* v. *Newbury,* 13 Vt. 496, has placed a construction upon that act, which we think must be conclusive upon us. In that case, the pauper was removed from Corinth to Newbury, and Newbury was held chargeable under the act of 1779, by the residence of the pauper in that town for one year previous to 1787. It was only upon the ground that a settlement was gained in Newbury under the act of 1779, by a residence of one year in that town, that the order of removal in that case was sustained. The question must be regarded as settled by that case, that a legal settlement could be gained in any town in this state, previous to 1787, and under the act of 1779, The court were therefore correct in their charge to the jury, that Eleazer Hathorn, senior, obtained a legal settlement in Reading, if between 1779 and 1787, he resided in that town, as his home, continuously, for the period of one year. In that event, the doctrine is fully established by the authorities that Eleazer Hathorn, jr., the father of this pauper, obtained a derivative settlement in Reading from the settlement of his father in that town. The case of *Wells* v. *Westhaven,* 5 Vt. 322 seems to be decisive on this subject. The right of a derivative settlement, by the father of this pauper, was not lost for the want of express statutory provisions on the subject

of derivative settlements, as that right is made to rest on general principles. It was observed by Justice WILLIAMS, in the case last cited, that " the law in relation to derivative settlements depends " upon the principles of the common law, and not on any statute reg- " ulations, and that the decisions in England are authorities upon " any question on that subject arising previous to 1817." This subject, in relation to derivative settlements, was fully considered, and the doctrine, as held in the case of *Wells* v. *Westhaven*, was sustained in the House of Lords, in England in the late case of .*Adamson* v. *Barbour*, 28 Eng. L. & Eq. 38. The same doctrine is sustained in other states; *Freetown* v. *Taunton*, 16 Mass. 52 ; *Landaff* v. *Atkinson*, 8 N. H. 534; Reeve. Dom. Rel. 298. We come to the conclusion, therefore, that Eleazer Hathorn, jr., the pauper's father, had a derivative settlement from his father in Reading, under the act of 1779, provided, during his minority, his father resided in that town one full year previous to 1787 ; and also, that he obtained a settlement under that act, *in his own right*, if, after he became of age, he resided in that town for one year previous to that time.

But it is insisted, that if the father of this pauper obtained a settlement in Reading, either derivative or in his own right, that settlement was lost and abandoned by his removal from this state to New Hampshire, soon after 1787, and his residence in that state until 1825, and that, under such circumstances, he could not communicate a derivative settlement to the pauper, who was born in that state. This objection seems to be met mainly by decisions in this state. In the case of *Wells* v. *Westhaven*, it was observed, that " if a father gains a settlement in this state for himself, it is " communicated to his minor children, whether living with him " or not ;" and in *Georgia* v. *Grand Isle*, 1 Vt. 470, it was held, " that " a settlement once obtained in this state, was not lost by the sub- " sequent acquisition of a settlement in another state." It results, from that case, that a derivative settlement can be communicated by a father having such a settlement to his minor children, though born in another state, if the father, during their minority, remove with them into this state. The cases in Massachusetts sustain that doctrine; *Townsend* v. *Bellinica*, 10 Mass. 411 ; *Canton* v. *Bently*, 11 Mass. 441 ; *Cambridge* v. *Lexington*, 1 Pick. 509. A differ-

ent rule would probably apply to children born in a foreign country of parents domiciled there, though the father may have had a settlement in this state, and when the father, during their minority, never returned to this state. Such children would be, in every sense of the word, aliens, owing no allegiance to this country, but would be under a natural allegiance to the country in which they were born. It can be said, with much propriety, that when that relation to this country ceases, the party is deprived of communicating to children so born, a derivative settlement. But however that may be, we think the pauper, in this case, obtained a derivative settlement in this state, if her father had obtained a previous one in Reading; and that depends upon his actual residence in that town for one year after he became of age, or upon the actual residence of Eleazer, senior, in that town for the same period, during the minority of Eleazer, jr.

The jury, under the charge of the court, have found that an actual residence of that character was had by one or the other of those persons. In either event the result will be the same. The father of this pauper would have a derivative settlement in the one case, or a settlement in his own right in the other; and the place of his settlement, would be the legal settlement of this pauper, but for the circumstance that she has, by her residence in Andover, subsequently acquired a settlement in that town. The important and remaining inquiry in the case then arises, whether that finding of the jury as to the actual residence of Eleazer, senior, and Eleazer, junior, in Reading, previous to 1787, was had on competent and legal testimony. If it was, that finding of the jury is conclusive, and the residence of the pauper in Andover will give her a settlement in that town, as she had a previous one communicated to her by the settlement of her father in Reading. To prove the actual residence of the pauper's father in Reading, and also that of Eleazer, senior, the depositions of several witnesses were offered, and read in evidence to the jury. In relation to all of them, with one exception, it may be observed that they refer simply to the declarations of Eleazer, Jr., as to his former residence, and that also of his father, Eleazer, senior, in Reading, and made many years afterwards; and also to the declarations of other members of the family, as to the residence of those persons

in that town.   If those declarations had been made by him, during his residence there, perhaps they might have been competent evidence, as they might be considered part of the *res gestae*, explaining the character of his residence, whether temporary or permanent.   But when such declarations are not cotemporaneous with the fact to be proved, we know of no principle that will admit them as evidence in the case. *Baptiste* v. *Vourburn*, 5 Har. & John. 86.   1 Greenl. Ev. § 108.   *Gorham* v. *Canton*, 5 Greenl. 266. The actual residence of those persons in Reading, between the years 1779 and 1787, cannot be proved by reputation or family tradition for the purpose of creating a legal settlement.   Testimony of that character has been received to show the relationship of individuals, the pedigree of families, and in some other cases where it is the interest of the family to preserve a knowledge of the facts to be proved; 1 Greenl. Ev. § 111; *Ward* v. *Oxford*, 8 Pick. 477 ; but we do not find that it has ever been extended to cases of this character.   The admission of that testimony cannot be urged on the ground that it was competent in proof of the identity of the parties, as the exceptions state that the testimony was offered and received to prove the residence of those persons in Reading, and for that purpose alone they were admitted by the court.   We think the testimony for that purpose ought not to have been received.

The result is that the judgment of the county court is reversed and the case remanded: